ILLINOIS, The. See Case No. 4,376.

————

## Case No. 7,005.

The ILLINOIS.

The A. J. WHITE.

The G. W. CHEEK.

[2 Flip. 383;[1] 11 Chi. Leg. News, 237; 4 Cin. Law Bul. 170.]

District Court, W. D. Tennessee. April 3, 1879.

MARITIME LIENS FOR NECESSARIES — REMEDY TO ENFORCE LIEN—WAIVER OF LIEN—CONDITIONAL ACCEPTANCE OF DEED OF TRUST — C. O. D. CLAIMS NOT LIENS—BAR LEASES NOT LIENS—INSURANCE PREMIUMS — MORTGAGE — PRIORITY — REPUDIATING TRUST DEED.

1. Contracts for necessaries furnished at the home port, are a lien for ninety days, under Code Tenn. § 1991, and it is not essential, under the statute, that credit should be given to the ship. The lien attaches to all contracts for the supplies, without reference to the fact whether the credit was given to the vessel or the owner.

[Disapproved in The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 402.]

2. The remedy for the enforcement of the lien given by sections 3550 and 3562 of the Tennessee Code, whether valid or invalid, does not defeat the lien or the jurisdiction of the admiralty court to enforce it.

[Cited in Louisville & N. R. Co. v. Railroad Com. of Tenn., 19 Fed. 712; Lighters Nos. 27 & 28, 6 C. C. A. 493, 57 Fed. 666.]

3. The taking of notes for the debts does not waive these liens. Nor does the taking of the deed of trust to one of libellants waive them.

4. The acceptance of a trust, conditional on its acceptance by other creditors, which they fail to do, excuses the trustee, and he will not be held to have forfeited his lien. Contra, Baxter, J. (on appeal).

5. Bills of lading, "C. O. D.," are not a lien on the boat to secure payment of the money

collected from the consignee on delivery of the goods, and will be disallowed.

[Cited in Re Insurance Co., 22 Fed. 115.]

6. The bar leases, or contracts for rent of the bar privileges, are not secured against breach by a lien on the boats, and where the boats were seized before the time expired, the allowance for the money paid in advance will not be preferred over other general creditors.

7. Premiums of insurance are a lien and will be so allowed.

8. A mortgage will be paid after lien claims and before general creditors.

[Cited in The J. E. Rumbell, 147 U. S. 557, 13 Sup. Ct. 502.]

9. Supply liens, under the statute, belong to same class as maritime liens for supplies, and will share with them and be paid in preference to the mortgage. Insurance premiums on policies issued prior to the mortgage will be preferred to it, but those on policies issued since the mortgage will be postponed till it is satisfied.

10. The packet company cannot repudiate their deed of trust, and general creditors may claim its benefits by petition against the remnants.

[11. Cited in Dillard v. Paton, 19 Fed. 624, to the point that regulations prescribed by merchants to define and control the usages or customs which shall prevail in their intercourse with each other have not the effect of positive statutes, and the courts do not particularly favor them.]

The Memphis and Vicksburg Packet Company was duly incorporated under the laws of Tennessee, having its home office at Memphis. Three steamers belonged to it: The Illinois, the G. W. Cheek, and the A. J. White. They were duly enrolled in the custom-house in that city. The plan was (afterwards carried out) to run these vessels from Memphis to Vicksburg, making regular trips, also, to Helena and Napoleon, Ark., and stopping, as occasion required, at the different landings. The proof showed that the company had a large credit and had used it in the purchase of supplies, making repairs, etc., without any serious question on the part of creditors until the fall and winter of 1876–1877. The vessels were supposed to be worth between $50,000 and $60,000, at that time. Becoming somewhat pressed for money, certain creditors, especially one N. M. Jones, offered to aid the company, and advised the drawing up of a deed of trust, in his favor as trustee—being, as he then declared, of the opinion that he could so manage the vessels as to pay off the debts. Accordingly, on the 16th day of November, 1876, such a deed was made to him, as trustee, for the purpose of securing all creditors. He accepted the trust, and began the running of the boats, and so continued for about one month. The deed was registered in the office for registration of deeds in Shelby county and, also, in the custom-house. This not only embraced the boats, but other property not belonging to the steamers, such as office furniture, books and accounts due to the company, an iron safe, etc., etc. For years prior to the making of this deed money was borrowed, repairs made and supplies

————

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

purchased under the direction of George W. Cheek, who was one of the principal owners of the boats and superintendent of affairs. The owners lived in Memphis, where the general business was transacted. Prior to the deed of trust to Jones, the M. & V. P. Co. had made a mortgage on the Illinois to secure J. C. Neely and Louis Hanauer, who, at Cheek's request, had indorsed the company's note for $5,000, which they eventually had to pay.

The facts seemed to point to Jones, trustee, etc., as the party who instigated the filing of the libels. The mate, the engineer of, and a seaman on, the G. W. Cheek, caused that vessel to be seized by process prayed for and duly issued on the 13th day of December, 1876. A tug belonging to Brown and Jones brought the marshal alongside of this vessel, where the attachment was executed. Turner, one of the libellants just named, was paid off by Jones, trustee, within three hours after his libel was filed. He swore that Captain Darragh, one of the captains under Jones, requested him to swear it out and promised that he would be paid the amount of his claims, if he would do so. The deed provided that G. W. Cheek should be paid $50 per week for his services, and if Jones did not pay off the debts by the 1st day of August, 1877, on the request of any creditor, it became his duty to sell off one or all the boats. Another provision in the deed was, that Jones, "as said trustee, was to take charge of, manage and run said steamboats in the trades in which they are respectively engaged, so long as paying rates can be obtained, and the business in his judgment be made profitable, with full power and control of the same, and authority to repair, insure, and do other things necessary to preserve the value and efficiency of said boats, and also to employ officers, agents," etc. On December 13, 1876, Karr filed his libel in the district court against the A. J. White, following those of the engineer, mate and seaman. Monaghan filed a libel against the G. W. Cheek, on the 21st day of December, 1876; Karr, against the Illinois, on the 13th day of December, 1876, and at same time and within a few days thereafter the other libels (intervening) were filed. Jones (the trustee), as surviving partner of Brown & Jones, filed his several libels against each of the vessels, on the 20th day of December, 1876, claiming, as did other libellants, the right to proceed against the vessels under the maritime and state laws to enforce liens for supplies and materials furnished, and setting forth particularly his separate claims, such as occurred within three months prior to the filing of the same, under the provisions of the state law. There was no allegation in the libels that the company, at the time of furnishing supplies, was in such an unsatisfactory condition, financially, as that no prudent man would give it credit, nor that the boats required credit. Some of them did allege that credit

was given to said boats by saying that the items were charged to them. There was no allegation in any of the cases of a special contract made with the master or owners of the boats that supplies were to be charged to them, by reason of the fact the furnisher or furnishers of such supplies were unwilling to give credit to the company. Nor did any of the libels allege that there was a necessity for credit to be given to the boats. One of the libellants alleged that Cheek said he should charge, in one particular case, the bill to one of the boats, naming it; while to another he said he should so charge the supplies furnished in that case, because C. wanted to keep the accounts of each boat separate. The company had abundant credit. In fact, there was no evidence introduced to show that it had been refused that at any time. Karr, one of the original libellants, in giving his testimony, stated that he always charged supplies to the boat. In answer to the question, whether, when the parties purchasing lived in Memphis and were responsible, he was in the habit of looking to the owners of the boat for pay, he said he had never, in any instance, given credit to the owner instead of the boat. He, as all other libellants, seemed to go upon the idea in all cases that, whether the owners were responsible or not, all they had to do was to charge the goods to the boats; and all the articles furnished were so charged in each case, according to the books and accounts which were brought forward, without any reference whatever to the solvency or insolvency of the owners. The lien of the state was declared on in Karr's and other libels, as follows (the same form as adopted by many others): "Libellants further allege and propound that, by the statute laws of the state of Tennessee, they have a positive, express and declared lien on the said steamer, for all supplies, materials, articles, repairs that appear from the said accounts—herewith filed—to have been furnished said steamboat within the period of ninety days of filing of these libels, which they hereby specifically state and charge," etc. Two of Karr's amended libels were filed March 14, 1877; another February 26, 1877. The only charges of insolvency were made in his amended libels. They did not allege that as an existing fact at the time credit was given, nor was there any proof in the record to that effect.

Jones, the trustee, on the 21st day of December, 1876, presented his petition in the district court, praying for an immediate sale of said vessels already libelled, in which, among other things, he stated that he was "willing to yield up his trust, so far as he is concerned, if necessary, to the purposes of this court, but not to affect or prejudice the rights or claims of any of the creditors herein, and he reserves his title to said property, if necessary, under said trust, to sustain the same, and claims possession." He alleged that it was necessary to the interests of all

parties that the boats should at once be sold, as the business season was passing away rapidly. To this petition he filed, as an exhibit, the following paper (addressed to the district judge): "Your petitioners, the undersigned creditors of the steamboats A. J. White, Geo. W. Cheek, and Illinois, have carefully read and examined the petition of N. M. Jones, trustee, under the assignment of the Vicksburg & Memphis Packet Co., heretofore made. We do hereby earnestly advise that the said steamboats be immediately sold upon such terms and in such manner as the honorable court may decree correct and proper. The amounts opposite our names indicate and show the total sums of money due us from said steamboats. We are urged to invoke the immediate action of the court in this particular, on account of the rapidly increasing charges and costs of keeping said boats. Experience shows that the longer such property is allowed to remain unused and idle the more the value of the same depreciates." Reference was then made to the shortness of the business season, and in conclusion, they asked "that an immediate sale be made." This paper was signed by Karr and several other persons and firms who had filed libels. The amount placed opposite Karr's name was $11,147.57, and the sum found following the name of each signer of the paper, represented the amount due him, without reference to that by him stated in his libel, in which he endeavored to reach what had fallen due within the three months preceding the filing of the same. Karr, himself, in his own, did not claim above $2,500. The libels in the main were brought to enforce liens for supplies, repairs, etc. But there were several other classes of claims, which were sought to be enforced as liens. H. Luhrman and John Long claimed the right to proceed against the vessels by reason of the fact that they had leased and rented, for the term of one year, running from the 10th of June, 1876 to the 10th of June, 1877, * * * the bar privileges on the decks and cabins. Besides these, there were a number of libels filed by insurance companies, claiming liens on the boats for unpaid premiums. There were other claims on which libels were filed, called C. O. D. claims. Many goods were delivered by the steamers at landings on the river for the shippers, the understanding being that the boat taking them would collect the money on delivery thereof, and on its return pay it over to the shipper; but this last-named agreement was not expressed in the bills of lading. Davis, a witness, who was clerk on one of the steamers, testified that, as a general rule, the boats charged per centage for collections, but in the particular case in which he testified, nothing was demanded for such service, as the shipper was a good customer. It was insisted that these were contracts of affreightment. The bar leases, it was alleged, were charter-parties.

It was further urged by Neely and Hanauer, who intervened by petition, that they had a prior lien on one of the boats—the Illinois, by virtue of their mortgage, at least, as to all supplies furnished subsequent thereto. Several other petitions were filed by general creditors, claiming proceeds under 43d rule.

The claimants by their answers denied that under the state or general admiralty law, any lien was given libellants for supplies, because the credits were not given to the boats in strict admiralty sense, nor was any necessity alleged or shown for such credits. Captain Darragh, one of Jones' captains, purchased one of the boats, and the other two, claimants alleged, were bought in by parties acting in the interest of Jones, though there was little or no proof on this latter point. The vessels brought $22,900 at the sale. The claims proven amounted to $27,386.

The United States district attorney intervened for the government, claiming liens for hospital dues; and there were claims also for wharfage. There was proof to show that the company, by Cheek, the superintendent, was in the habit of making notes to different persons furnishing supplies and repairs, for articles so furnished, and that the same had been so taken. The proof tended to show that the company was in the habit, now and then, of borrowing money out of bank, and that in good seasons the boats did a large and profitable business. During the season of 1876–1877 it was not good; the navigation of the river being interrupted by ice, was one of the reasons.

On the 24th day of February, 1877, without a trial of the questions, it was referred to a commissioner to take and state an account of the amounts due different parties, and to report not only what was due libellants, but the character of their claims, and also their priorities under the admiralty law. This report was made and filed February 4, 1878. The commissioner reported the sale of the boats under a former order, and the rank of priorities. He allowed, 1st, seamen's wages (these had already been paid), the bar leases and hospital dues; 2d, C. O. D. claims; 3d, material men and supplies furnished in home port. The fund was nearly exhausted after paying these, else (as stated by him) he would have allowed, as next claim, the mortgage of Neely & Hanauer, and afterwards the general creditors. To this report many exceptions were filed by different parties on various grounds. Judge TRIGG heard the argument on the exceptions in the spring of 1878, but after the lapse of nearly a year made no decision upon the matter. The questions in dispute were then brought before Judge HAMMOND. The state boat act is referred to and quoted word for word in the opinion of the court.

The claimants were represented by Cal-

vin F. Vance, W. W. Murray, and Wm. S. Flippin.

The following proctors appeared for other parties: H. C. Warinner, R. D. Jordan, Thos. W. Brown, O. P. Lyles, Humes & Poston, Wat. Strong, Pierce & Dix, Weatherford & Estes, Harris, McKisick & Turley, Adams, Dixon & Adams, L. & E. Lehman, Gantt & Patterson, D. M. Scales, S. S. Garrett, John B. Clough, Ass't Dist. Atty., and Myers & Sneed.

Mr. Jordan argued, that libellants stand before the court as supply and material men, seeking by a proceeding in rem in admiralty to enforce a lien, given by the statute law of Tennessee, for articles furnished and delivered in the home port to the steamboats libelled and seized within the ninety days prior to the filing of said libels. These supplies consisted of coal, ship stores, furniture, repairs and other articles needed on the three steamers, furnished upon a contract with the masters thereof. These were beyond doubt maritime contracts. See The Lottawanna, 21 Wall. [88 U. S.] 580–598, and The St. Lawrence, 1 Black [66 U. S.] 522, that in all cases where the local law gives a lien courts of admiralty will enforce the lien upon the ship in rem. The Gen'l Smith, 4 Wheat. [17 U. S.] 438; Peyroux v. Howard, 7 Pet. [32 U. S.] 324; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175; The St. Lawrence, 1 Black [66 U. S.] 522. Unquestionably, it is the local law that gives the right, and such right is administered according to that law. That was so under the former rule of 1844. Unless there be ambiguity or doubt, these liens will be so found; otherwise, according to the principles of maritime law. 2 Pars. Adm. 324, and cases cited in note; The Young Sam [Case No. 18,186]; 1 Conk. Adm. 7–19, 201; Peyroux v. Howard, 7 Pet. [32 U. S.] 324; The St. Lawrence, 1 Black [66 U. S.] 522; The Lottawanna, 21 Wall. [88 U. S.] 579. And see Code Tenn. § 1991, which is very clear and does not admit of a doubtful construction. Proceeding under this statute, we have only to allege and prove that, under a contract with the master or owner of the vessel, the materials or articles were furnished for or toward the repairing, fitting, furnishing or equipping said vessels. The allegations and proof show that the articles were furnished and the repairs were done on the credit of the vessel. I insist that this, however, is not necessary in the case of material men enforcing a state lien against a vessel in her home port, for articles and repairs furnished and done in her home port. The only attempt at authority for such a position, is an obiter dictum in The Lottawanna, 21 Wall. [88 U. S.] 579 et seq. The new 12th rule does not require that it shall be alleged and proved that credit was given to the boat, nor does it require that we should allege and prove

that the owners were insolvent, and the supplies and repairs were necessary. Unless it should appear that supplies were enormous in amount and the repairs unreasonable, the presumption of law is that those things, which appear to be furnished to a vessel under that head, are necessary, and the burden of proof rests on the claimants to show otherwise. It nowhere appears in any way, shape or form, that Brown and Jones accepted the trust deed. This trust deed is void: First, by reserving on its face a benefit for the makers; second, it unreasonably prolongs the time of sale, as against the rights of parties secured by express statute. Being void, there could be no legally binding acceptance under said trust deed by any one—not even by Jones. Burrill, Assignm. 255–257, 345, 346. In the absence of proof that the general creditors accepted under the trust deed, the presumption is that a trust deed being for their benefit, they accept the terms of it and take their rights under it. But as to those libellants, who furnished supplies, materials and repairs within the ninety days prior to the date of the deed, it was against their interest, and a positive injury, for they were a favored class of creditors under the state law. The presumption arises in their favor that they did not accept.

(Mr. Warinner, who argued all the questions elaborately, though requested so to do, failed to furnish the reporter with a brief, and no others were handed to the reporter, except the ones mentioned herein.)

Mr. Vance dwelt particularly upon the effect of the trust deed taken by Jones. He said: Jones not only received a delivery of the deed but acted under it for a month. He never declared an abandonment of the trust but had a sale of the boats made under it by the court, and only declared that, if necessary, he would declare an abandonment of the trust. He never, to this day, filed a deed to the property to any one. In whom did the property in these steamboats vest by the conveyance in trust? In N. M. Jones. And the power was coupled with an interest which, in the language of our supreme court, is irrevocable. Wilburn v. Spofford, 4 Sneed, 699. Could the estate divest by his mere unwillingness to act? The law says that he could not rid himself of the trust he had assumed without the consent of the cestuis que trust and the decree of a court. Jones v. Stockett, 2 Bland, 409; Cruger v. Halliday, 11 Paige, 314; Breedlove v. Stump, 3 Yerg. 257; 4 Ves. 100; 1 Atk. 18; 1 Jac. & W. 689. In Maxwell v. Finnie, 6 Cold. 434, our supreme court decide that, in a proceeding to remove a trustee, all the parties interested must be made parties to it, the debtor, as well as the creditor and trustee. And so particular are the courts as to the appointment of new trustees, that, in Watkins v.

Specht, 7 Cold. 595, the court held that a court could not appoint one, where the original trustee died; the heirs of the dead trustee not being made parties to the proceeding. Evidently, the provisions of our Code show that a trustee can neither resign his trust nor be removed, without the interposition of a court.

Mr. Flippin.

If the position which counsel assume is correct—that material men have a lien irrespective of any other consideration, by virtue of the state statute giving a lien (conceding for the sake of argument that it does give such a lien) then a state lien is higher than a maritime lien in a home port. Yet how anomalous this would be, for the courts decide that liens of material men, claiming under the general maritime law, are to be preferred over—what are by some called—quasi maritime liens under state statutes. The John T. Moore [Case No. 7,430]. To state the proposition is to refute it.[2] Counsel ask of what benefit is it for them to go into the admiralty court, if the law is as I contend. The answer is easy. A sale of the vessel under the state law gives no good title; besides, it is necessary to apply by petition to the circuit judge to obtain permission to have an attachment to issue, which he will only grant upon good cause shown. This of itself involves delay, whereas in the admiralty all that has to be done is to draw a libel, give security, and the process issues. And this is what Judge Bradley means when he speaks of "obstructions and embarrassments" arising under the state liens. The Lottawanna, 21 Wall. [88 U. S.] 579. The new 12th rule gives its own meaning in clear language. No intention is manifested to put home and foreign ports in the same rank. Nor to make liens, enforceable in home ports, equal to admiralty liens, but simply to provide that, as in a foreign port a libel may be filed if according to the rules of the maritime law, the same thing may be done in the home port when conformable to admiralty rules. No other change was intended. The presumption of credit was not altered, nor the necessity for the same. Need it be said that if congress was by act now to place home and foreign liens

on a basis of equal rank, that the rules of the admiralty as to credit and necessity for credit would still apply? Congress may regulate liens, the supreme court may provide rules, but the general admiralty law is and will continue to be part and parcel of any system that may be adopted. Liens will never be given where no necessity for credit exists. These libellants had a right under the state law to seize these boats—no one questions that; but they give credit only to the owners in such cases and not to the boats. See case of Waggoner v. St. John, 3 South. Law Rev. No. 4, 10 Heisk. 503, where Judge Freeman puts his decision on the ground that the state proceeding is not in rem, but against the owners of the boat, citing The Hine v. Trevor, 4 Wall. [71 U. S.] 556; The Moses Taylor, Id. 424; and The Belfast, 7 Wall. [74 U. S.] 624; and showing wherein our statute differs from other state acts which recognize proceedings in rem under state statutes. According to our statute in state practice, after judgment had against the owner, an execution issues against his property, and can be levied upon the boat attached, or anything else the owner has. See 10 Heisk. 503. In the admiralty such liens, as we have already said, cannot be enforced unless the credit is given to the boat, and not to the owner. The rule is, whether there is a lien capable of being enforced or not, the owner is always bound, but the ship is a distinct person and cannot be bound at all, unless credit is given to that, and not to the owners. Taylor v. Commonwealth [Case No. 13,787], per Miller, J. This same judge (same case) gives the test of credit. He says: "That is determined by the intention of the party at the time of giving it." Acting upon this rule, and referring to the libels and proof, it will be readily perceived that none of the articles furnished were upon the credit of the boats in the admiralty sense. For many of these notes were taken, while in others there is no allegation of credit being given to the vessel, and certainly no proof. The allegations of credit, when made, rest simply upon the fact as to how the charges were made upon the books. Liens are discouraged, and are in no case acquired, by material men, when the owners are present, unless the former are insolvent, or the credit necessarily is given to the vessel. [Pratt v. Reed] 19 How. [60 U. S.] 359; [People's Ferry Co. v. Beers] 20 How. [61 U. S.] 393; [Roach v. Chapman] 22 How. [63 U. S.] 129; [Beaubien v. Beaubien] 23 How. [64 U. S.] 193; and Taylor v. Commonwealth. [Case No. 13,788]. It would seem that these principles are too well settled to admit of argument. If it were shown that the Mem. & Vicksburg Packet Co. was insolvent at the time the supplies were furnished and was refused credit, or was in such financial difficulties that no prudent man would credit it, such fact

---

[2] See what is said in The E. A. Barnard, 2 Fed. 721. Speaking of priority as between maritime and state liens, Butler, J., says: "They, the latter, are quasi maritime, have uniformly been so considered by the courts, and are recognized and allowed only after all maritime liens proper are paid. The creditors holding them are citizens of the state, and it is provided to direct the order in which their claims shall be paid. To allow state legislation a greater effect would be to concede the right to alter and change the maritime law of the nation in a most material respect. The right to so change and alter has been most emphatically denied (as in principle it must be) whenever the subject has been mentioned. The Lottawanna, 21 Wall. [88 U. S.] 580; The St. Lawrence, 1 Black [66 U. S.] 522; and other cases therein cited.

would go far towards making out a case against the vessels. But no grounds like these are alleged in any of the libels, unless the exception be in the amended ones of Karr, filed February 26 and March 14, 1877, which declare that the company was insolvent at the time the supplies were furnished; but they do not allege this as a ground for necessity of credit. It was clearly an after thought, and the ninety days had already barred nearly all the items of the account. Neither was there proof that such insolvency existed, nor of any necessity for credit at that time. Credit must be given to the boat before the lien attaches. And this ought to be the law for the plainest reasons. If it were otherwise, unscrupulous creditors could make out and present unjust bills, and if not settled upon the spot, threaten the boat with a libel; or becoming offended with the owners for some petty difference, such as a transfer of their custom to another house, or for some other interested motive, would have it in their power just at the moment of sailing, to seriously embarrass the movements of a vessel. More than that—if some shrewd person should ingratiate himself into the confidence of a few larger creditors, he might compel an assignment at almost any time, as that would be deemed better by the owners than to be libelled at an inauspicious moment with ruin staring them in the face. I contend that this state gives at least only a doubtful lien. And this court, not the state court, is to construe that lien. In this particular case, in the absence of other reasons, it becomes necessary. Judge Turley declared in 5 Sneed, 391, that the proceeding contemplated by the statute is against the boat, * * * it is required to be against the owners of the boat * * * but not for the purpose of enforcing satisfaction of the debt by a judgment against them personally. A state cannot execute a process in rem by proceeding against the boat as a boat, for that contravenes the doctrine in The Hine v. Trevor, The Belfast, and The Moses Taylor [supra]. Judge Freeman's construction of this statute has already been given, the opposite of that of Judge Turley. According to the former ruling the statute would, in effect, amount to concurrent jurisdiction with the admiralty court, while in the latter the proceeding would be a mode of simply bringing the owner into the state court for the purpose of compelling him to give security for his debt. It will be seen that it would be unsafe for the admiralty in causes of this kind to accept the construction of the supreme court of the state. Having exclusive jurisdiction it has the exclusive right to construe this class of statutes, and should not abandon that prerogative. It is to fix the limits of state action with reference to its own jurisdiction, and not for the highest court of the state to do that for itself.

While this court will follow the interpretation of a local statute given by the supreme court of a state, it never follows such laws, or the construction of laws in a state as interferes with its own jurisdiction or with the general law. And this applies to cases in common law, equity and admiralty equally. See [Chicago v. Robbins] 2 Black [67 U. S.] 418; [Williamson v. Berry] 8 How. [49 U. S.] 495; [Swift v. Tyson] 16 Pet. [41 U. S.] 1; [Carpenter v. Providence Washington Ins. Co.] Id. 495; [Miller v. Austen] 13 How. [54 U. S.] 218; [Foxcroft v. Mallett] 4 How. [45 U. S.] 358; Watson v. Tarpley, 18 How. [59 U. S.] 517; Sandford v. Portsmouth [Case No. 12,-315]. The construction of an old English statute by a state court does not bind this court. Construction of the statute of limitations by the highest court of a state does bind, but where the statute of 21 Jac. 1, c. 6, is only partially altered, the construction of the statute by the state court as to the altered parts binds, but not as to the general terms of the statute. This court is bound only by constructions of state courts as to local laws, but not by constructions of laws or statutes which are in general acceptation. Clearly, therefore, the construction of a state court as to the words "fitting," "furnishing," and "equipping," when applied to boats, does not bind this court, for these are words that peculiarly and exclusively pertain to commerce and navigation.

Now it is not insisted here that the state can give the statutory lien upon any other than a maritime contract. The first part of the statute, fixing a lien upon "building," etc., does not figure here. The contention is, what do the words immediately following mean? "Materials or other articles furnished, for or towards the repairing, fitting, furnishing or equipping such boat." It includes evidently such materials or articles as are used in furnishing, fitting, or equipping the boat at the beginning of its career, and afterwards such materials as are used in repairing it. See Roach v. Chapman, 22 How. [63 U. S.] 129 (and Edwards v. Elliott, 21 Wall. [88 U. S.] 532), where it is ruled that furnishing an engine—or fitting the boat with an engine—was not a maritime contract. Materials towards fitting, furnishing or equipping a boat are clearly not maritime contracts, for these relate exclusively towards finishing the boat. They are simply land contracts. If the libels, founded on the statute, are good for anything, only those which are for repairs and material therefor fall within the favored class. "Equip," when applied to a ship, means to dress it, to furnish it with a complete lot of articles necessary to it, qua ship. "Furnish," is in this connection, to fit up, to equip. "Fit," refers in nautical language to furnishing a ship with men and necessary tackle, equipage, etc. In certain cases "furnish" may mean more; not so here. But to settle this matter beyond dispute—the cap-

tion to the act of 1833, carried into the Code (section 1991), is as follows: "An act for the benefit of mechanics." If it is still the law that the caption of an act is a part of it—if that is the key to unlock and disclose the intent of the legislature—then it is plain that only builders and repairers and materials for repairs were to be favored. The original act is repeated almost word for word in section 1991. That reads as follows: "Whenever a debt shall be contracted by the master, owner, agent or consignee of any steam or keel boat, within this state, by and on account of any work done, or materials or articles furnished for, or towards the building, repairing, fitting, furnishing, or equipping such steam or keel boat, shall be a lien," etc.,—the rest of the section precisely as in section 1991. The word "consignee" is left out, but the sense, idea, and intention are the same as in the original act. When we look at the Tennessee act we see that there is no intention to establish a lien in favor of maritime contracts, nor a lien of a maritime nature, but its object is simply and solely to secure any one who might perform work on a boat and furnish materials or articles towards building, repairing, fitting, furnishing or equipping any keel or steam boat, or for supplies or wages due to hands. The legislature did not intend to give these parties any priorities over common law liens, as is clearly manifested by the eighth section of the act. Here is in fact a distinct announcement that such a provision or lien does not possess the characteristics of a maritime or quasi-maritime lien. And it would be difficult to enforce such a lien against boats under the new 12th rule, it falling in that class of state liens which could with great difficulty be enforced, and, perhaps, not at all, in some cases, in the admiralty.

The bar leases are in no sense maritime contracts. They are not charter-parties, no particular part of the ship being specified; nor are they contracts of affreightment, because such are made to take goods on at a certain place to be delivered at a certain other place. They have no necessary connection with commerce or navigation. Besides these leases were assigned, and the lien is personal. See 14 Am. Law T., April, 1877; Morris v. McCulloch [83 Pa. St. 34]; Patchin v. The A. D. Patchin [Case No. 10,794]; Reppert v. Robinson [Id. 11,703]; Sturtevant v. The George Nicholaus [Id. 13,578]; Logan v. The Aeolian [Id. 8,465]; Rusk v. The Freestone [Id. 12,143]; Pearsons v. Tincker, 36 Me. 384–386; 23 Me. 282; 40 N. H. 511; 5 Eng. (Ark.) 411. There are only two cases looking the other way: The Boston [Case No. 1,669] and The General Jackson [Id. 5,-314]; but very peculiar circumstances surrounded them.

The conclusion is reached that there are no liens—neither maritime nor state—that can be enforced here by the libels, and therefore they should be dismissed with costs. If, however, the court should think the giving of credit to the vessels was not necessary in order to charge the vessels—still the state lien does not cover more than the repairs—say $1,500. Unpaid premiums of insurance are not, upon principle, liens, but if it shall be thought proper to follow the ruling in The Dolphin [Cases Nos. 3,973, 3,974],—approved with a reservation to hereafter differ,—by Judge Swayne, there would be a charge on the registry of $1,500 more. The C. O. D. claims are not liens. They somewhat resemble contracts falling within the express business, but lack certain constituents. Perhaps they may be more properly classed under the head of banking or collecting—certainly, they are not purely maritime, or necessarily connected with commerce or navigation. Under the authority of Kemp v. Coughtry,[3] 11 Johns. 107, the owners would be clearly liable at common law, but not so the ship. Had the master signed a bill of lading covenanting to return the money when collected, there is no doubt the vessel would have been bound because this would have been within his authority, but not so as to collecting the money. He had no authority for that to bind the ship. He entered into no agreement to do either the one or the other.

The claim of Neely and Hanauer is a legal lien. They have come in by petition under the 43d rule, claiming proceeds in the registry to the amount of $5,000, which arose from sale of the Illinois. They are entitled to that sum, and the claimants willingly agree that it shall be paid. This with the two other claims, if allowed as liens, will swell the amount to be taken out of the registry to $8,000.

I have not gone into the question of priority between mortgagees and material men, because I do not think the latter here have any lien. The authorities are conflicting, but the weight seems to be in favor of the material men. The Norfolk [Case No. 10,-297]; The Skylark [Id. 12,928]; The St. Joseph [Id. 12,229], denying The Grace Greenwood [Id. 5,652]; Francis v. The Harrison [Id. 5,038]; The Circassian [Id. 2,721]. But while they have priority over a lien under the state laws, it does not relate back so as to give that priority. See The St. Joseph [supra]; The Paragon [Case No. 10,708]; Marsh v. The Minnie [Id. 9,117]; 27 Ohio, 350; Scott's Case [Case No. 12,517]; The G. C. Morris [Id. 5,204]; and see The Mary [Id. 9,186]. There are other cases to the same point. This is no court of bankruptcy or insolvency, and it is decided in The Lottawanna, 20 Wall. [87 U. S.] 221, and The Edith, 94 U. S. 519, that the proceeds arising from the sale, if unaffected by lien, become by operation of law the absolute property of the owner, citing Brown v. Lull [Case No. 2,018]; [Sheppard v. Taylor] 5 Pet. [30 U. S.] 675;

---

[3] And see 6 Johns. 160, and 10 Johns. 1.

Brown. & L. 87–91; Fitz v. The Amelie [Case No. 4,838]; [The Amelia] 6 Wall. [73 U. S.] 30. The admiralty court is invested with no jurisdiction to distribute such property of the owner any more than any other property belonging to him. Where there is an application under the 43d rule for remnants, and the owner does not oppose, such may be paid out—not otherwise.

Messrs. Humes & Poston.

On a correct construction of the Tennessee statutes creating this lien, the priority between a mortgage and home claims for supplies, materials, etc., is determined by the order of time in which the registration of the mortgage and the creation of the home claims occurred. Claimants under the state lien were not intended by the legislature to have priority over common law liens, which is shown by the eighth section of the act, providing "that where there are prior liens on said boats by judgments obtained by the general creditors of the owners, it shall be the duty of the sheriff to attach such boat, subject to such prior liens, and only the surplus over such prior lien shall be paid into court for distribution." The requirements of this section unmistakably show that the legislature did not intend to create a lien of the nature and character of a maritime lien, for here they expressly make the lien they are creating subject to a judgment lien of general creditors of the owners in a common law court. An express negation of this lien possessing the nature of a maritime lien is contained in the statute. The statutory lien is given by the same terms to builders, material men, and mariners (hands), and puts them all on the same footing, not preferring mariners' wages as a court of admiralty, but compelling them to share pro rata with builders and all others entitled to the statutory lien. The lien given by the state statute is to be enforced in accord with the construction of the statute by a local law. The Lottawanna, 21 Wall. [88 U. S.] 578; The Edith, 94 U. S. 518.

On preference between mortgagees and material men and waiver the following cases were referred to and discussed: Scott's Case [Case No. 2,517]; Dudley v. The Superior [Id. 4,115]; The Grace Greenwood [Id. 5,652]; The Skylark [Id. 12,928]; The Kate Hinchman [Id. 12,620]; The Alice Getty [Id. 193]; The St. Joseph [Id. 12,229]; 2 Pars. Shipp. & Adm. 152; The Nestor [Case No. 10,126]; [The Palmyra] 12 Wheat. [25 U. S.] 611; 2 Hagg. 136; [Peyroux v. Howard] 7 Pet. [32 U. S.] 345; [The St. Lawrence] 1 Black [66 U. S.] 532; [Andrews v. Wall] 3 How. [44 U. S.] 573; Stapp v. The Swallow [Case No. 13,305]; 1 New. 186; 7 Heisk. 612; Id. 617; 2 Humph. 248; 2 Head, 128; 3 Humph. 616; Mart. & Y. 309; 9 Pa. St. 203.

HAMMOND, J. The first question in this case arises out of the claim to a lien by those parties who have furnished supplies, materials, and repairs at Memphis, the home port. The lien is claimed under a state statute, which reads as follows; "Any debt contracted by the master, owner, agent, or consignee of any steam or keel boat, within this state, on account of any work done, or materials or other articles furnished for or towards the building, repairing, fitting, furnishing, or equipping such boat, or for any wages due to the hands of the same, shall be a lien upon such boat, her tackle and furniture, to continue for three months from the time said work is finished, or said materials or articles furnished, or said wages fall due, and until the termination of any suit that may be brought for said debt.' Thomp. & S. Code Tenn. § 1991.

There may be incongruity in the doctrine that, an admiralty court possessing under a grant in the constitution of the United States exclusive jurisdiction of all civil causes of admiralty and maritime jurisdiction (Rev. St. § 563, subsec. 8), shall find any rule of conduct in a statute of a state; it is not, however, anomalous when we consider that the federal courts often find themselves in other departments of the law, administering rights and rules of property having no other foundation than state statutes or local custom. But whether incongruous or not, it is now the settled law of this court that "so long as congress does not interpose to regulate the subject, the rights of material men furnishing necessaries to a vessel in her home port may be regulated in each state by state legislation." And, "the district courts of the United States having jurisdiction of the contract as a maritime one, may enforce liens given for its security, even when created by the state laws." The Lottawanna, 21 Wall. [88 U. S.] 558, 580; Norton v. Switzer, 93 U. S. 355, 366. And it is just as well settled by the same cases and prior adjudications that for material men furnishing necessaries to a vessel in her home port by the general maritime law of the United States there is no lien, other than such as is given by the local law. Id.; The Edith, 94 U. S. 518.

This is now a principle of our maritime law too firmly established, whether correctly or not, to admit of further controversy in the inferior courts. It would be profitless to follow the perplexities of this subject by any attempt to reconcile the cases, or the criticisms that have been made upon them. 5 Am. Law Rev. 581; 7 Am. Law Rev. 1; 9 Am. Law Rev. 633; The Hina v. Trevor [4 Wall. (71 U. S.) 555]; 7 Am. Law Reg. 513; 14 Am. Law Reg. 593; 18 Alb. Law J. 191. Nor need we consider any difficulties which may arise in practice as having any influence here to limit the rule laid down for our government in the matter. Until congress does legislate, the courts

must wrestle each with the demon of its own distraction, and follow that of the supreme court whithersoever it shall go, deciding each case as it arises according to its own circumstances. The Theodore Perry [Case No. 13,879].

It is argued by the learned counsel for the claimants, with great confidence, and the argument is pressed with the earnestness of conviction, that, because by the general maritime law no lien for supplies exists, whether in a home or foreign port, unless credit be given to the vessel, it is not competent for the legislature of the state to expand the lien and give any more enlarged right. It is said that this state statute must be construed as if it read, "any debt contracted by the master, etc., and when the credit is given to the vessel, shall be a lien, etc."

Much proof has been introduced by both sides. On the one hand to prove that credit was in fact given to these vessels, and on the other that it was not. The result of it all is, that if it is necessary to the existence of the lien to show that credit was given to these vessels in the sense of the general maritime law, I have no doubt the proof falls short of such a showing, and that it does show that this company had abundant credit at home, where the supplies were furnished, to have procured them without reference to any lien. The presumption of law is that they were procured on the credit of the owner when furnished in the home port, and I think the proof does not rebut that presumption. At all events, I shall assume, for the purposes of this judgment, that such is the state of proof.

But I do not think it at all essential to the lien that the credit should have been given to the vessels. The statute does not say so, and it would be an interpolation to attach any such condition to it. Ordinarily it would seem clearly within the power of a legislature, authorized to legislate on the subject of maritime law, to exercise the same freedom of enactment that it possesses over other subjects, and prescribe the limitations of the statute according to its will. If the states have left to them any power of legislation (and this we cannot now doubt), having for its object the security of maritime contracts by providing liens for them, it necessarily follows that there is no limitation to the power except such as is found in the state or federal constitutions. That it may create a lien is manifest, for in this very class of cases, it having been determined that by the general law there is no lien, the narrow one insisted on by the claimants here is as much a creation as the broader one claimed by the libellants. It will not do to look to the continental maritime law of Europe, or other countries, to find limitations on the power of the legislature of the state of Tennessee. Granted that by that law no lien exists

for supplies unless credit is given to the vessel, non constat that a lien may not be created by competent legislative action, which dispenses with the limitation as to credit, or rather creates a lien without reference to that fact. It would not be denied that the legislative authorities of Continental Europe, from which it is said this lien is derived, might alter it and declare a lien in cases where credit was given to the owner; then why may not the legislature of Tennessee do likewise, particularly since it has been finally determined that, as to this lien, the general maritime law is not in force in this country? Not being recognized here, it seems to me we cannot regard it as furnishing in its limitations any principle of construction for our own laws, and that we may regulate the lien as we please.

But this is said to be a jurisdictional question, and that the necessity for construing this statute as giving a lien only where credit is given to the vessel arises out of the constitutional restriction of our jurisdiction to "cases of admiralty and maritime jurisdiction." Const. U. S. art. 3, § 2. It is argued that unless credit is given to the vessel it is not a maritime lien, and therefore not within the constitutional grant.

This is the question over again which has become chronic in the courts of admiralty, namely, whether we are confined to the maritime law as it existed when the constitution was adopted, or may expand the jurisdiction to meet the wants of commerce and navigation, and so keep pace with the growth of civilization. The supreme court have time and again ruled that this clause in the constitution is not to be so strictly construed as to defeat the capacity for expansion, and that we are not limited to either the maritime law of the civilians or that of our mother country. Ex parte Easton, 95 U. S. 70.

The development of this view of admiralty jurisdiction, in the face of much prejudice, is one of the most interesting examples of the elasticity of our laws in accommodating themselves to the exigencies of our progress as a people. See 18 Alb. Law J. 191, and 5 Am. Law Rev. 581, where the cases are grouped, and The Hine v. Trevor, 4 Wall. [71 U. S.] 562.

There is no limitation of the legislative power to be implied from this restriction on the judicial power. Whether legislative control of the subject is vested in congress or in the state legislatures, concurrently in both, or partly in one and partly in the other, it is absolute; and whether we look to the one source of legislation or both in a given case, the judicial power is competent to afford a remedy to enforce whatever rights it may be found the legislature has created. It is sufficient for our purpose here that the highest court, having charge of the jurisdiction, has said that, as to this lien,

by whatever name you call it, which secures a maritime contract, the states may legislate and this court enforce the legislation. Ex parte McNiel, 13 Wall. [80 U. S.] 236–243; The Lottawanna, supra; Norton v. Switzer, supra; and the cases cited in 5 Am. Law Rev. 614. It seems to me not inappropriate to call any lien which secures a maritime contract, whether given by the "venerable law of the sea" or by a statute passed to create it, a maritime lien, and in this sense it would satisfy the terms of the constitutional grant, and proceedings to enforce it would be a case of "maritime jurisdiction." 5 Am. Law Rev. 603, 613; 4 Am. Law Reg. 599. But as I understand it the jurisdiction does not depend upon the lien, whether maritime or statutory, but solely upon the character of the contract itself, irrespective of the lien. If the contract be maritime, this court has jurisdiction to enforce it, proceeding either in personam or in rem, as the case may require. It is true that in the case of Edwards v. Elliott, 21 Wall. [88 U. S.] 556, the court say that "state legislatures have no authority to create a maritime lien; nor can they confer any jurisdiction upon a state court to enforce such a lien by a suit or proceeding in rem, as practiced in the admiralty courts." And this formula is repeated in Norton v. Switzer, 93 U. S. 356, and elsewhere in the cases. In the first case the court decided that the contract was not a maritime one, being a contract to build a ship, and, therefore, while it was competent for the state legislature to create and enforce any lien in reference to it deemed expedient, it was not such a lien as a court of admiralty could enforce. In the second case the contract was that of a master to superintend repairs, and it was held no lien existed except in cases where the lien is created by statute, and the case reasserts the doctrine of The Lottawanna. It would seem from these cases and others that the court does not treat the lien for supplies at the home port, given by the state legislature, as a maritime lien, and this would seem to militate against the idea that it should be a maritime lien in order to render the statute valid. They treat it as a statutory lien, or lien by local law, and claim the jurisdiction only because the contract is maritime. 5 Am. Law Rev. 581, 603; The Orleans, 11 Pet. [36 U. S.] 175, 184; and other cases cited above. In the case of The St. Lawrence, 1 Black [66 U. S.] 522–529, it is said that "the right to proceed against the property in rem is a mere question of process and not of jurisdiction." And the court held that where, upon the principles of the maritime code, the supplies are presumed to be furnished on the credit of the vessel, or where a lien is given by the local law, the party is entitled to proceed in rem in the admiralty court to enforce it: but where the supplies are presumed by the maritime code to be furnished on the personal credit of the owner or master, and the local law gives him no lien, although the contract is maritime, yet he must seek his remedy against the person and not against the vessel. In either case the contract is equally within the jurisdiction of a court of admiralty. This would indicate very clearly that the supreme court did not conceive the idea that the lien must be maritime in the sense that credit must be given to the vessel where the party relies on the local law, or that it is only competent for the local law to give the lien in cases where the credit is given to the vessel. Again: inasmuch as this alleged restriction on the legislative power arises out of the limitation supposed to be found in the federal constitution, it is as fatal to the power of congress to create a lien where there is no credit given to the vessel as to the state legislature, because congress can no more enlarge the judicial power beyond the constitutional grant than the legislature; and we have as the product of the argument, that no legislative power exists to advance us one step beyond the law of one hundred years ago; and it must be supposed, contrary to what was said in The Lottawanna, 21 Wall. [88 U. S.] 577, that the framers of the constitution did "contemplate that the law should remain forever unalterable."

Nor do I find it quite correct to say that by the general maritime law this element of credit to the vessel was essential to the existence of the lien given by that law. The lien for supplies attached ipso facto when they were furnished. But it was a lien easily displaced and was considered to be waived whenever the credit was in fact, or presumably given to the owner either in the home or foreign port. Mr. Justice Clifford in The Lottawanna, passim. It seems that this element of credit given to the ship, as an essential condition precedent to the attaching of the lien, is the result of the modifications of the maritime law and acts of parliament. Id.; The Albany [Case No. 131]. And while it must be admitted that wherever the lien finds its origin in the maritime law of our own country this feature of credit to the ship is indispensable, I do not think there is any want of power in the state legislature or congress to provide a lien for a maritime contract which does dispense with it, capable of enforcement in the admiralty courts. What has been said in support of this position is more in deference to the very earnest arguments of able counsel than from any conviction of doubt as to the proper ruling on the point.

The chief difficulty I have had with this statute proceeds from the construction given by the supreme court of Tennessee in the case of Waggoner v. St. John, 10 Heisk. 503. It will be observed that the Code of Tennessee (section 3550 and following) provides a statutory proceeding to enforce the lien given by the section above quoted (section

1991). In order to sustain the jurisdiction of the state courts over this lien the supreme court of Tennessee is at great pains to demonstrate that it is not an admiralty lien, at all, but simply a remedy against the owner with ancillary attachment process to enforce a judgment against him. In the case of The Edith, 94 U. S. 518–523, it is said by the supreme court of the United States that similar statutory provisions for enforcing the lien in the state of New York had been adjudged invalid because beyond the power of the state legislature. And, say the court, "if they are invalid, it may be doubted whether all the provisions purporting to give a lien are not also invalid, because inseparable from the prescribed means of enforcing it." But the point is not decided, and the court ruled against the lien in that case only because it had expired by limitation of the statute itself. It is to be carefully observed that while this case was finally decided in 1876, it arose before the promulgation of the admiralty rule 12 of 1872, and what is quoted above doubtless refers to the law as it was understood under the prohibitory rule 12 of 1859. Whether the courts of the United States would decide these statutory provisions for enforcing the lien, given by the Tennessee Code, to be beyond the power of the state legislature or follow the supreme court of the state in construing them, is not a question now presented for determination. See Weston v. Morse, 40 Wis. 455. If it be admitted that the ruling in Waggoner v. St. John, supra, is correct, or whether correct or not, binding on the federal courts as a declaration of local law to which we must look for the determination of the rights of the parties as to the character of this lien, the question is, "are the means prescribed for enforcing a lien given by the statute so inseparable from the provisions of the statute creating the lien that they become a part of it, and serve to so characterize the lien as to altogether defeat the jurisdiction of the admiralty court." By the section 1991 a lien is given in terms broad enough to include any character of lien whatever, for there is absolutely no qualification to it, nor is it in terms described to be of any particular kind of lien. All the contracts, which it is given to secure, are maritime contracts, except of building boats or furnishing materials for building them; and as we have already seen, the contracts being maritime, this court, except as to the two non-maritime contracts above mentioned, has jurisdiction to enforce the lien as thus provided. Nothing can be argued from this separation of the sections (3550–3562) which prescribe a remedy to enforce this lien in the state courts from that which creates it, for they are all parts of the same act of 1833, c. 35. How does the fact that the legislature has provided a remedy to enforce in the state courts a lien created by statute (which we have seen need not in itself be maritime in any other sense than

that it secures a maritime contract to give this court jurisdiction to enforce it) preclude this court from taking notice of the lien? If the jurisdiction here does not depend on the character of the lien, but only on the nature of the contract, I cannot see that we should be so precluded. Nor do I see any objection whatever to satisfying the debt in either court to which the creditor may choose to resort. He has a security—created by statute—called a lien, which practically is nothing more or less than a right to seize and sell the boat by judicial process for the satisfaction of his debt. It is so defined in Dupont v. Vance, 19 How. [60 U. S.] 169. Cumulation of remedies is not anomalous, and creditors often have choice of several with distinctive advantages or disadvantages for each. Liens may be and are variously denominated as equitable, statutory, judicial, common law, maritime, or by some other description drawn from the connection they have with a particular subject, but it is in my judgment wholly misleading to found upon these distinctions any restrictions which take them out of the category of intangible privileges and erect them into substantial landmarks of jurisdiction. They possess no such quality, but on the contrary are mobile, wholly without inherent characteristics of their own, and dependent upon extrinsic circumstances for distinctive names. Mere securities for the performance of obligations, always the creatures of law, or contract of the parties, they take just such forms as are impressed upon them by the will of the parties or the law-making power. A lien is a right—jus ad rem, or jus in re—to be enforced by remedies such as may be ordained by the law, and never the source of these remedies. Liens do not create remedies and are generally wholly independent of them, one remedy serving to enforce different characters of liens oftentimes; sometimes the lien does not depend on the remedy but springs out of it; in cases like this they are so independent that they may be created by state statute and the remedy by federal law. Hence, it seems to me the lien provided by this statute, may, if the creditor resorts to a proceeding in rem in the admiralty court, take on the form and be called an admiralty or maritime lien because attached to a maritime contract, just as a mechanic's lien is so called because attached to a mechanic's contract (although the name is wholly immaterial), or if he resorts to the state court, takes the form and character of an attachment lien as described by the supreme court of Tennessee. The state court has jurisdiction (if it has) because the legislature, by its act, has authorized it to take hold of the property of a citizen in a particular way and satisfy the debt, and not because it is a lien of any particular description. And we have jurisdiction here—because congress has vested us with jurisdiction of maritime contracts and authorized us to take hold of the property in a particular way and satisfy the lien, and not because it is a par-

ticular kind of lien. It is not the lien that gives us jurisdiction; it is the contract. The particular way of the state court, that is, a proceeding by summons and attachment is not within our jurisdiction, nor is our particular way, that is, a proceeding in rem, within their jurisdiction; not because in either case of any inherent nature of the lien, but because in the one case the state court has not had granted to it the power to proceed irrespective of the ownership in invitum against the res as the offending thing for a decree of sale, which will bind all the world and give a good title to the purchaser; and in the other this court has not had granted to it the power to adopt a peculiar statutory remedy found in the statutes of the state; but has had a grant of power to look to the statute of the state to see whether any security has been given upon a maritime contract, which so attaches to a vessel engaged in maritime commerce, her tackle, apparel and furniture that it can be enforced by admiralty process. If so, we will resort to that process to satisfy that security whenever the contract is maritime, and never otherwise.

I have no doubt that if the lien sprung out of the process of seizure pointed out by the statute and depended for its existence upon the issuance or levy of that process, or, in other words, if it were a lien similar to that of a levied execution, this court could not enforce it for the obvious reason that it would be the creature of a process this court could not issue. But it is not such a lien; it is the creature of the statute, attaching by virtue of the issuance or levy of the process. Some of the contracts to which the lien attaches are maritime and some are not, as we have seen, but they all depend upon the contract and not the remedy. It is the subject matter of the contract in all of them which determines the question of lien or no lien, and not the fate of the process. Whether the process is served or levied, or not, the lien continues to exist. It is more analogous to a judgment lien for the enforcement of which the execution is only a proper process, and it exists as independently of the process issued to enforce it as does a judgment lien. And this is all, I think, the courts mean when they say, as in the case of The Edith, supra, that the lien must be separable from the means used to enforce it to be cognizable in a court of admiralty. Now, when the state courts come to provide the means to enforce a lien on ships engaged in commerce, given by state statutes, they must be careful not to invade the exclusive domain of the admiralty jurisdiction and undertake to sue the res, or to give their decrees the force and effect of a court of admiralty in such cases. They may seize the vessel as the property of the owner, but not as itself the defendant; they may, by their decree against the owner and order of sale, divest all persons of any interest which they claim by common right, but cannot divest any one of his rights under

the maritime law against his will. Whether the proceedings are of this nature or not depends upon their own individuality, and not upon that of either the lien or the contract. The existence of the lien does not necessarily depend upon the question whether the proceedings are valid. If the security, or lien, that is, the right of satisfaction out of the proceeds of the sale of the vessel, depends on or grows out of the proceedings themselves in the manner I have indicated, of course, this right must stand or fall with the proceedings. But if these failing, this right of satisfaction out of the thing still exists, whether there be any adequate remedy to enforce the right or not, it still has a potential existence as a right of property, and if given to a maritime contract this court will, by virtue of its admiralty power, afford a remedy either in personam or in rem according to its practice.

Because it is a lien attached to a maritime contract the states are not forbidden to provide non-maritime remedies to enforce it in their courts. They can provide no remedies for the admiralty courts, nor any for their own which amount to such as the admiralty courts use—but as to all others they are free to use them. Irrespective of those used by the state courts the admiralty courts will proceed in their own way to enforce whatever right of satisfaction out of the res may be found in the statute which is independent of any of the remedies available to the creditor. I think the judgment I now give, as expressed in this opinion, is the logical result of Ex parte McNiel and The Lottawanna, supra, and the action of the supreme court in abrogating the rule of 1859 and establishing that of 1872. Whenever the supreme court declared it to be an axiom of our national jurisprudence, as it did in Ex parte McNiel, that "a state law may give a substantial right of such a character that it may be enforced in the proper federal tribunal, whether it be a court of equity, of admiralty, or of common law," and in applying it to cases of admiralty jurisdiction directs us to the maritime character of the transaction itself as the sole test of jurisdiction, whether it took a new departure or not, it has cut loose from the confusion of the past, and started us upon a more hopeful basis for the administration of admiralty jurisdiction in cases like this than we had before.

It is in proof that about one month prior to the filing of these libels the corporation owning these boats conveyed them in trust to one N. M. Jones, for the general benefit of all the creditors, authorizing him to continue running them in the packet trade in which they were engaged, and if still unable to pay the debts, to sell them and distribute the proceeds pro rata. Jones went into the possession of the boats and did run them until seized in these suits.

It is argued that he instigated the libels,

not from any proof of the fact but because he is on the cost bonds and paid the same after the libels were filed and before the sale. I think this is not material and do not see that any one was injured even if he did instigate the libels. Creditors were threatening suits, and it was apparent the scheme to work out the debts through the trust had failed.

It is very earnestly insisted by the general creditors that these supply-lien creditors have waived their statutory liens by taking notes and accepting this deed of trust, and that except as to the mortgages sanctioned in the trust deed all the creditors must share the fund equally; and they seek to claim the fund as remnants because of the lien of this trust deed. It is now too well settled to need much citation of authority that neither the taking of a note, nor other security is a waiver of the implied lien or the statutory lien unless it was so intended. The St. Lawrence, 1 Black [66 U. S.] 522, 532; The Kimball, 3 Wall. [70 U. S.] 45; The Bird of Paradise, 5 Wall. [72 U. S.] 545–561; The Napoleon [Case No. 10,011]; Fitzgerald v. The H. A. Richmond [Id. 4,839]; The Eclipse [Id. 4,268]; The A. R. Dunlap [Id. 513]; The Theodore Perry [Id. 13,879]. To constitute an abandonment of a right secured there must be a clear, unequivocal and decisive act of the party, an act done which shows a determination in the individual not to have a benefit which is designed for him. Breedlove v. Stump, 3 Yerg. 257–276. No one is ever presumed to abandon a security the law gives him. The H. B. Foster [Case No. 6,291]. The burden of showing this intention to waive the lien is on the party who asserts the waiver. The James Guy [Id. 7,-195]. I should perhaps hold, if there were any proof in the record showing that these lien creditors had accepted this deed of trust, or, knowing of it, acquiesced in it, that prima facie their acceptance of it was from the nature of it a waiver of their liens, unless, by other proof, they should show that it was not so intended. But there is absolutely no proof whatever to show that any of them had accepted it, or knew of it, except Jones. It is said in argument, that the acceptance of the beneficiary will be presumed because the trust is for his benefit. It does not appear in the case that the trust was beneficial to the lien creditors. However, this presumption is only indulged in favor of the beneficiary, and not against him, and in the face of his protest against being bound by the trust. The presumption from the assertion here of the liens is that the trust was never accepted, until the contrary appears by proof.

As to Jones, he unquestionably did go into possession of the boats as trustee under the assignment, and the proof is clear that he was willing to accept it. Whether only as collateral to his statutory liens or in satisfaction of them, does not appear, but I think it clearly inferable from the circumstances that his acceptance of the office of trustee was in the hope of a successful experiment by which the debts should be paid. It was essential that all the creditors should acquiesce and go into the scheme of operating the boats through a trustee on their own account. This failing, I do not think he should be bound by his conduct to stand to the trust deed and be held to have waived his lien under the statute. The assent of a creditor to an assignment of this kind is coupled with the implied condition that other creditors shall also agree, and adversary proceedings by one of them would discharge him from his engagement. Hays v. Heidelberg, 9 Pa. St. 203. Nor does the fact that the creditor is trustee prevent him from surrendering the property and relying on his original contract. In re Saunders [Case No. 12,371].

The result is, that all the claims for supplies will be allowed as liens under the statute wherever they come within the ninety days limitation prescribed in the statute. But all claims for supplies not covered by the statute will be disallowed because they are not liens, and it has been expressly held that the time limited in the statute is binding as part of it. The Edith, 94 U. S. 514.

### C. O. D. Bills of Lading.

These boats respectively issued many bills of lading, of which the following is a specimen:

"Shipped in good order and condition by W. & S. Jack & Co: on account and risk of whom it may concern, on board the good steamboat Illinois, whereof ——— is master for the present voyage, the following packages or articles, which are to be delivered without delay, in like good order, at the port of Mound Place Landing (unavoidable dangers of the river and fire only excepted) unto Indon & Haxter or their assigns, he or they paying freight for said goods at rate of ——— and charges—C. O. D. $18.10.

"1 bbl. crockery, marked ———.

"Signed,          Priddy, Clerk.

"Dated Memphis, Tenn., Oct. 24, 1876."

It is proved by the testimony of witnesses that the letters "C. O. D." mean collect on delivery," and that the masters made these contracts with the assent of the owners. It is further proved that the understanding was that the goods were not to be delivered to the consignee until the consignor's price was collected from him on or before delivery, and that the money was to be then brought back to the consignor by the boat and paid over to him; that the usage and custom of the line was to envelop the money, seal the package, and mark the name of the consignor upon it, which said package was delivered to the secretary of the company at Memphis for delivery to the consignor. The money sued for was never paid over to the parties, but it

does not appear when or by whom it was appropriated or used. The libels in these cases were filed December 13, 1876, and the "C. O. D." bills of lading bear date from the beginning of the season, as far back as July or before, on to the date of the libels; and the aggregate amount allowed by the commissioner is $3,709.70. Hence it appears that it was not the custom to pay over or deliver these several sums of money, which it is claimed were shipped as so many packages of freight to the consignees thereof, namely the original consignors of the goods; and it appears that these consignees were not very prompt in enforcing a delivery of their said consignments. I infer from these facts that the parties did not really treat the money as shipped to the merchants' part of the cargo, but rather as collections made for them. It is not usual to break open packages and appropriate articles belonging to the cargo, to the extent this was done, either by the officers of the boat or by the warehousemen with whom they are stored.

It is argued that the contract, as thus proved, is a contract for the affreightment of the money as well as the goods, and its breach gives the consignor a lien on the boat. It is objected by the claimants that this parol proof is not admissible to alter the contract, as expressed in the bill of lading. Undoubtedly, ambiguities appearing in a written contract may be explained, and the letters "C. O. D." have come to be used as an abbreviation for "collect on delivery," and to authorize the carrier to receive payment for the merchant. At common law I doubt not that such authority would imply a contract on the part of the carrier to be responsible for the money. The implication would not arise on the words "collect on delivery," but out of the contract of agency. Those particular words are an authority to the agent to receive from the debtor the money due the creditor, and an agreement with the agent that he will not deliver the goods until they are paid for by the vendee. This is all that can be implied from them, and when the words are written in this bill of lading it is no longer ambiguous. After they are filled in, to go and add a contract that the money shall be shipped as cargo, and that for its safe delivery the owner, master and ship shall be liable as on a regular bill of lading, such as would be taken if money were in fact shipped as merchandise, seems to me to be altering this written contract in very important particulars. If this was the contract of the parties, why was it not so written in full? It is not only the parties who are interested in having contracts written out which are to bind the vessel, but all who deal with her. This bill of lading, except as to these three letters, is in the usual form, a form sanctioned by centuries of use, and every word and sentence in it has become settled, and the liabilities created by it are as well understood as a common law

deed to real estate. Even if it is competent for shippers to make the kind of contract, which it is insisted this is, it should be, when they undertake to reduce it to writing, included in the writing, and not left to implication. It is a wise rule which forbids parties after they have reduced their contract to writing to alter it by parol proof. "The bill of lading," says Valin, "is conclusive against the assured, and nothing can be admitted against its tenor." 2 Valin, Comm. 139, cited in The Phebe [Case No. 11,064].

"Although as a receipt, a bill of lading is subject to explanations and can be affected by parol proof, in so far as it is a contract this rule does not apply. The transfer of goods shipped, by indorsement of bills of lading, has become so common that the interests of commerce require that such instruments should not be controlled by parol evidence." Per Miller, J., in The Wellington [Case No. 17,384]; and see the note for other cases. Says Mr. Justice Story, in The Reeside [Id. 11,657]: "I own myself no friend to the almost indiscriminate habit of late years, of setting up particular usages and customs in almost all kinds of business and trade, to control, vary, or annul the general liabilities of parties under the common law, as well as under the commercial law. It has long appeared to me, that there is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstandings and misinterpretations and abuses, to outweigh the well known and well settled principles of law." This case is often cited and approved by the supreme court, and it seems to me the rule which forbids the introduction of parol proof to vary written contracts should be the more rigidly enforced where its effect is to create a right of property, such as a maritime lien for breach of contract of affreightment. I have therefore concluded to rule in this case that the parol evidence, which is offered to convert this contract into a formal contract for the affreightment of the money, is inadmissible.

If admitted, I would rule also, that it does not constitute such a contract as creates a lien under the maritime law. I have examined carefully all the cases cited in support of the doctrine and am of opinion that it is a clear innovation on the maritime law. The custom is one of modern date, which secures the merchant the price of his goods by sending them under an agreement that the carrier shall not deliver them until the price is paid. It is merely a conditional sale for the security of the contract price. The carrier becomes the agent of the creditor for the collection of the debts, and whatever may be the common law liability of the carrier as to his personal responsibility for the money collected by his agents, I shall not, until the supreme court settle the question, be prepared

to hold that there arises out of the contract, when the carrier is a vessel engaged in commerce, a maritime lien which can be enforced by a proceeding in rem. I have examined many cases to discover the principle upon which the doctrine rests that the merchandise is bound to the ship and the ship to the merchandise, and I do not see that it can be applied to contracts like this, in which the merchant, having sold his goods to his customer for convenience of collection and security, authorizes him to pay the price to the master of the vessel, and authorizes the master to collect it for him, or in default of payment to return the goods. I do not doubt but that the parties may by contract pledge the ship to the performance of the agreement including the safe return of the money collected, as is sometimes done in covenants inserted in a charter-party or bill of lading; and, perhaps, a court of admiralty might enforce the lien by proceedings in rem, as in those cases; but that is not the question here. Admit all the proof, and it is not even claimed that it goes to the extent of a contract pledging the ship in terms. The question is, does a lien arise by a tacit hypothecation of the ship on such a contract, under the maritime law? I think not. Any covenant outside the ordinary contract of affreightment would be secured only by a special contract for the purpose. The faithful performance of this contract of agency cannot be said to be secured as if it were an ordinary contract of affreightment for the money. Money may be shipped as merchandise, and on such a contract the liability of a contract of affreightment would attach. Here the master has no authority over the money except by reason of his instructions to collect it, and he is empowered to hold the goods till paid. The transportation of the money is not the object of the contract. It does not advance the argument to invoke the common law liability of common carriers. An express company would be personally liable, perhaps, under the strict rules of law governing common carriers for the misappropriation of the money on a "C. O. D." bill of lading, but there would be no lien on the cars or other vehicle transporting the goods or money; and so the owners of these boats would be personally liable at common law, but it is another thing to say that the maritime law gives a lien against the vessel which transports the goods.

The personal liability of the owner is not an element in the maritime law. The owner can, in cases where that law gives a lien, abandon his property in the ship, as in cases of salvage, for example, and relieve himself as to that law, from all personal liability whatever. The maritime law of the middle ages, we are told, imported into the ancient law of the sea the common law doctrine that the master is the agent of the owner, and may bind within the scope of his authority to a personal liability co-extensive with all his property in cases of contract certainly, and to a more limited extent in cases ex delicto; but when the master binds the ship itself by tacit hypothecation his authority, as agent, is not co-extensive with his authority in that capacity to bind the owner personally. The ship may be bound as a part of the property of the owner, like his other property, but it does not as a contracting thing, so to speak, become liable through a lien in all cases where the owner is liable personally. To earn freight is the highest duty of the ship acting through its master, and he may pledge its credit to that contract; he may bind the ship—if duly authorized—by special contracts of lien, but the lien is the product of the special agreement that it shall be a lien, not the product of the maritime law as a tacit hypothecation or pure maritime lien. We cannot overlook this distinction in determining the influence of the common law doctrine of agency as connected with the power of the master to bind the owner, and to bind the ship, and reach a conclusion as to whether a given transaction is within the scope of his authority. He may have authority, as agent, to bind the owner personally, and even to pledge by contract that the ship shall be liable for certain specified covenants in a charter-party or bill of lading, but it may not be within his authority as master to fasten to his ship a tacit lien for the security of extraordinary covenants, not specifically expressed in his contract, but implied necessarily from it. Judge Ware, of whom the supreme court say his opinion in matters of maritime law is entitled to the highest respect (Ex parte Easton, 95 U. S. 76), calls our attention to this distinction in the case of The Waldo [Case No. 17,056]. He cites the leading common law case, relied on here, of Kemp v. Coughtry, 11 Johns. 107, and points out that it is not an authority on this question; and I think the case is a very satisfactory authority against this lien, not so much as an adjudication but in the enunciation of a principle which must be of controlling importance. The cases cited in The Ann Elizabeth (Dupont De Nemours v. Vance), 19 How. [60 U. S.] 162, at page 169, are instructive on this subject, and open up abundant authority for the position taken here, that there are necessary limitations to the rule that the ship is tacitly bound to the merchandise for contracts of affreightment.

In The Volunteer [Case No. 16,991], it is said that the right to proceed in rem against the ship for breach of contracts in the charter-party, is founded on a stipulation in the contract that it shall be so, and not out of any tacit hypothecation, such as I am asked here to imply. The Rebecca [Id. 11,-619] states most clearly the principle on which the ship is held bound. And The Phebe [Id. 11,064] points out that the master

can only specifically bind the ship when acting within the scope of his authority as master. It speaks of a contract of sale "disguised" under a contract of affreightment. These cases are a guide to many more, which will illustrate the distinctions. The cases cited, in argument, of Mosely v. Lord, 2 Conn. 389; Emery v. Hersey, 4 Greenl. 407 (cited in The Waldo, supra); Harrington v. McShane, 2 Watts, 443; Pierce v. Milwaukee & St. P. R. Co., 23 Wis. 387,—are all in the same category that Judge Ware puts Kemp v. Coughtry, supra. The Hardy [Case No. 6,056] is only a syllabus, and the opinion not being given, is not convincing. Monteith v. Kirkpatrick [Id. 9,721] only holds that where the transportation was partly on waters not within admiralty jurisdiction, the contract was entire and not severable. The Argyle Worthington, 17 Ohio, 460, was under a statute of Ohio giving a lien in such cases, and perhaps, like supply liens in home ports, it is within the power of the legislature to create such. The case of Zollinger v. The Emma [Case No. 18,218] is directly in favor of the lien, and against the views here expressed, but with all my deference for the venerable and learned court, I am constrained to dissent from it and follow the ruling in this circuit to the contrary by the late Judge Emmons in the cases of The Liberty and The Commercial, not reported, but cited by him in The Williams [Id. 17,710], by the name of The Robinson [Id. 6,128]. It has always been a matter of regret that the learned judge did not write, as he intended, his opinion in that case. It is ingeniously urged that this case is a better case for the lien than the one decided by Judge Emmons, and that the defects in the proof of that case have been supplied here. I was of counsel in that case for the liens, and I feel quite sure the learned judge would have decided this the same way. But whether so or not, I am content to take the broad ground that nothing less than a covenant to bind the ship to the faithful performance of the master's contract of agency in collecting the money for the shipper will create a lien in favor of such contracts, unless they are bona fide contracts of affreightment for the money as merchandise, which I do not think they are. These claims on the "C. O. D." bills of lading are disallowed.[4]

_____

[4] Using the first edition of the Revised Statutes while investigating the point, I came to the conclusion that Rev. St. § 4281 did not affect the "C. O. D." bills of lading, because the section did not apply to the rivers. See section 4289 (1st Ed.). But since the act of Feb. 18, 1875, c. 80, (18 Stat. p. 320; Rev. St. § 4279, 2d Ed.), it probably does apply, and is a complete answer to the libels, since it is not pretended that that section was complied with.

The original act of March 3, 1851, § 2, 9 Stat. 635. was limited by the 7th section of that act so that it did not apply to rivers, and the first edition of the Rev. St. § 4289, so limited it. Now, by act of Feb. 18, 1875, c. 80, 18 Stat. 320, this section 4289 is itself limited to the same preceding sections, which do not include

## The Bar Leases.

When these boats commenced the season's business the owners made contracts for the bar privileges in the form of indentures, and they are called in the record "leases." In the case of the Illinois, the price paid was $3,500 cash, in consideration of which "the parties of the first part hereby lease and rent to the party of the second part for the term of one year running time from the 10th of June, 1876, to the 10th of June, 1877—time to be * * * by the portage book—the bar privileges, deck and cabin, of the Illinois, the said steamer belonging to the Memphis & Vicksburg Packet Company, and is now running between Memphis and Vicksburg." "It is agreed that there shall be but three barkeepers and tenders, and in case the party of the second part shall not keep as good liquors as in other boats of the line or shall make themselves obnoxious to the detriment of the boat, the company reserves the privilege of re-entering, taking and retaining possession of the bar or bars at their option, unless the wrong is corrected and notice given, etc.; and in such case the party of the second part forfeits all moneys paid on said bars and all rights to further privileges of the same." And it makes provision that the keepers or tenders shall be under command of the officers. Similar contracts were made as to the other boats in the line.

Being seized under the process here before the time expired, these libels are filed to recover back the money paid for the unexpired time, as damages for breach of the contract, and the commissioner has allowed an aggregate sum of $5,052 as such damages, and as a preferred claim of the first class. There is no proof introduced to show what is meant by a bar privilege. I am asked to take judicial notice that a certain space in the cabin or on the deck is set apart as a "bar," and it is then argued that this is a charter-party or contract for the hiring of that part of the boat known as the "bar," and the failure to keep the charterers in possession is a breach of the contract of charter-party, for which the vessel is liable and a lien attaches.

This illustrates the tendency of all manner of claimants to relegate their claim to some form of contract, which shall carry a lien on the boat, and the capacity for expansion of these liens seems never to be wanting in time of need.

It will be observed that no space measured by metes and bounds, or quantity of ton-

_____

section 4289; and it seems that section does now apply to rivers. The act of 1871, c. 100, § 69, without referring to the act of March 3, 1851, c. 43, § 2, enlarges that act as to articles enumerated, but otherwise repeals it in haec verba. Section 41 of the act of 1871, in terms applied the act to all vessels navigating the rivers. This section is carried into the Revised Statutes at section 4400. On the whole it is clear the section 4281 exempts these vessels from liability, even if this were a contract of affreightment for which the owners and vessel could be made liable.

nage or aliquot part of the carrying capacity of the boat, is designated as the part let to charter. It is said, however, that by a well-known usage the locus in quo is fixed by the term "bar." It will be also seen that the instrument is not drawn on the theory that it is the charter of a part of a vessel for the purpose of carrying freight. But it is said that the charterer need not fill his space or use it for storing freight. He may, paying for it, let it go empty. This is so, yet it is plain that the leading idea of a charter-party is that the vessel or a part of her is hired for the purposes of commerce, carrying goods as freight, or passengers, or otherwise put to some use incident to commerce and navigation. And it is to encourage such commerce and navigation the lien is allowed for its breach. If a charterer lets his vessel or part thereof go empty, he may have to pay the charter money, but the vessel could not be liable to him for any breach, as none could probably occur.

I think this contract is just what it purports to be, a common law contract, for the sale of the privilege of selling liquors on the boat to three persons travelling on her. I think it just as well to treat it as a contract of affreightment for the liquors and barkeepers, as was suggested and argued, as a charter-party, and that in no proper sense can it be treated as either. It is a mere license. The apple-woman, the newsboy, the book-peddler and lunch-vender, who have leave to ply their trade among the passengers while the vessel is afloat, or at shore; or the barber, who travels with her, may as well claim to be charterers as these barkeepers. No case holding that a breach of such contracts is a lien has been produced.

But it is said, it has been ruled so in the cases of The Liberty and The Commercial, supra, in this court. So it was, so far as confirming a report, wherein it was allowed is a ruling. It is true that an exception was filed, and the case being appealed, Judge Emmons heard argument. He kept the cases under advisement, and my recollection is, when he returned he expressed no opinion on this barlease question but delivered an elaborate oral judgment on the main controversy in these cases, which was the question of C. O. D. bills of lading, and, that being an arrangement of counsel, the report was confirmed; each getting allowances excepted to and all satisfied in the general average. It was in this way the bar-lease question passed sub silentio. I have verified my recollection of the circumstances by that of other counsel not engaged here, and I do not understand that it is insisted that Judge Emmons gave an opinion, but only that on exception and after argument the point was ruled in favor of the lien.

Where no reasons are given, I do not think in a case like that, or this, where many exceptions are filed and numerous points ruled, that such rulings should stand for prece-dents. Unless they come nearer to my own judgment than does this, I do not feel bound by them. These claims are disallowed.

### Insurance Premiums.

Certain underwriters have filed claims for insurance premiums for which some notes had been taken—which are tendered back—and it is claimed these premiums are a lien by the maritime law. The objection that these notes are a waiver of the lien, or that the taking of Jones' note as trustee is such waiver, has already been disposed of in considering the question with reference to the supply liens. Such securities are not a waiver unless so intended, and there is no proof of such intention here.

The question as to whether these premiums are a lien under the maritime law has not been decided by the supreme court and the rulings are not in accord in the other courts. In The John T. Moore [Case No. 7,430], Judge Woods decided against the lien, and there are perhaps other rulings the same way. But in The Dolphin [Cases Nos. 3,973 and 3,974], Judge Brown, of the Michigan district, decided that they were a lien, and his opinion was approved by Mr. Justice Swayne, the circuit justice of this circuit, on appeal. This is binding on me as authority, and I rule, therefore, in favor of the lien, and the claims will be so allowed.

### The Mortgage.

It appears that A. J. White & Co. were indorsers on the notes of the packet company, which had been discounted in bank, and being unable to renew, application was made to J. C. Neely and Louis Hanauer, who indorsed the renewed paper and took a mortgage to secure the indorsement on one of these boats for the amount of the note, which was $5,000. They intervene by petition and claim a paramount lien. The mortgage was duly registered both under the act of congress and the state registration laws. It does not appear for what special purpose the original money was lent to be used, but that it was used in the business of the company in running these boats may be admitted. If it be conceded that he who advances money to procure supplies would stand in the same attitude as the furnisher of supplies, and that it would be such a maritime contract as would support the jurisdiction of this court to foreclose the lien of the mortgage given to secure it by proceedings in rem, it would not apply to this case. The original money was advanced by the bank on commercial paper, with A. J. White & Co. as indorsers. This debt was paid by proceeds of the loan secured on Neely & Hanauer's indorsement, and it would be carrying the doctrine very far to consider this last loan as an advance of money for necessary supplies. The money actually had for that purpose was paid, and I think this was not a maritime contract, and this court would have no jurisdiction to enforce it as such. It is only a common law

mortgage, and it seems that the only right in this court such a mortgage has is to claim the res by award, as owner sub modo, or petition under the 43d rule as against the proceeds of sale. The John Jay (Bogart) 17 How. [58 U. S.] 399; The Angelique (Schuchardt v. Babbidge) 19 How. [60 U. S.] 239; People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393; The Lottawanna, 20 Wall. [87 U. S.] 201, 222; S. C. 21 Wall. [88 U. S.] 583. The rules of admiralty pleading should be strictly complied with. McKinlay v. Morrish, 21 How. [62 U. S.] 343, 347.

I think, therefore, the objection to this libel is well taken, but it should have been taken in limine, and the practice of allowing such objections to be taken to a pleading at the final hearing on exceptions to the report of the commissioners is intolerable, and I shall therefore now allow the mortgagees to convert, by amendment, their libel [5] into an answer and claim of the res, or into a petition under the 43d rule, as they may elect. I think the act of congress regulating mortgages is only a registry act and does not give the court jurisdiction to treat this mortgage as a maritime lien under maritime law. But it is a lien, which this court can enforce in the way above suggested.

### Priorities.

I am informed by the learned circuit judge of this circuit, that he has established the rule for this circuit, that liens for supplies under a state statute take precedence of mortgages like this, and rank in the same class and share pro rata with supply liens under the general maritime law. This is binding on us here, and the liens here allowed of that class will be first paid. See, also, Zollinger v. The Emma [Case No. 18,218]; The Alice Getty [Id. 193]; The Unadilla [Id. 14,332]; The St. Joseph [Id. 12,229]; The Paragon [Id. 10,708]; 6 Am. Law Reg. 551; Id. 328.[6] The Theodore Perry [Case No. 13,879]; The Grace Greenwood [Id. 5,652]; The Kate Hinchman [Id. 7,620]; In re Scott [Id. 12,517]; Francis v. The Harrison [Id. 5,038].

The authorities put liens for insurance premiums in the lowest class of maritime liens. I do not see, if they are maritime liens, why they should not take precedence of common law mortgages, except where they have become due on policies taken out since the date of the mortgage. In that case, being only for the benefit of the owner's interest and not being in any way beneficial to the mortgagee, I think they should not be allowed to displace the mortgage. All premiums on policies taken out prior to the mortgage will be first paid; all since will be postponed to it.

### General Creditors.

I think the company cannot repudiate the Jones deed of trust, and that its provisions

are a lien for the benefit of general creditors, which they may enforce under the 43d rule. Only two I believe have filed such petitions. Ordinarily, I would not allow after the hearing any others to come in to their prejudice. But these only came in under that rule at the hearing, and I shall now allow all creditors to prove their claims as under one general petition. I do this because of the awkward practice adopted in this case of leaving questions of pleading to be determined at the hearing. This Jones deed of trust will inure to them as a lien against remnants. The Edith, 94 U. S. 518–523.

### Costs.

The creditors whose claims have been allowed as liens will be allowed their costs. Those whose claims have not been allowed will pay their own costs.

### Circuit Court of United States, Western Tennessee,

#### April 16, 1881.

Neely and Hanauer, the mortgagees, having appealed from the decree of the district, to the circuit, court, the same was heard this day by the Hon. JOHN BAXTER, Mr. Humes appearing for the appellants and Mr. Warinner and Mr. Jordan for N. M. Jones, surviving partner, etc. The court "reverses the decree below in so far as it allows the demand of N. M. Jones, surviving partner, etc., to be paid in priority of the mortgage claims of the said J. C. Neely and L. Hanauer, when, in fact, the said N. M. Jones, surviving partner, etc., had waived said lien so far as said J. C. Neely and L. Hanauer, mortgage creditors, are concerned."

NOTE. It will be noticed that Judge Hammond does not discuss one of the points made by counsel, which is that under the Tennessee boat act all liens stand on an equal footing, and as some of the articles or contracts for which a lien is given, are not maritime in their nature a difficulty of a serious character towards their enforcement or partial enforcement in an admiralty court was suggested. See the language of Judge Taney in The St. Lawrence, 1 Black [66 U. S.] 530, 531, with reference to the difficulties of enforcing state liens in admiralty. The principal point, however, on which the case was made to turn was, that a lien in the home port would be enforced if the contract was maritime, and if the state boat act covers it, irrespective of other considerations. It will be remembered that counsel refers to The Young Sam [Case No. 18,186]. Judge Brown, in The General Burnside [3 Fed. 228], refers to the same case, and also to 2 Pars. Shipp. 154 (which quotes that case), as authority for the doctrine that no necessity for credit in the home port need be shown, but that the lien is conferred by the state statute "whenever the supplies are furnished." Perhaps, this is the only one seemingly applicable. The Young Sam [supra] was decided twenty-five years ago. The curious reader, it is believed, will readily discover that the statement, quoted as law, is mere dictum. It will be observed that the only question before the court was, whether under the statute of Maine, giving parties who furnish supplies a lien, included a vessel generally, or whether it alone covered the case of a vessel

---

[5] Mistake of counsel and court. It was a petition.

[6] [See Case No. 9,117.]

particularly named. The judge ruled that if the vessel were sought to be held under a given name, the lien would be enforced (according to several different rulings in that circuit), but as the supplies were furnished to build a vessel not described by name, he would refuse to enforce it. Now that was all there was before the court or in the case. And the court's views on the first proposition have long since been repeatedly repudiated upon the ground that supplies furnished towards the building of ships are, not maritime, but land contracts, and therefore are entitled to no lien under the state boat acts. The Antelope [Case No. 482]; Foster v. Ellis [Id. 4,968]; People's Ferry Co. v. Beers, 20 How. [61 U. S.] 400; Roach v. Chapman, 22 How. [63 U. S.] 129; Hardy v. The Ruggles [Case No. 6,062]; Smith v. The Royal George [Id. 13,- 102]; and Edwards v. Elliott, 21 Wall. [88 U. S.] 532. It is stated in The Young Sam that the lien exists by virtue of the state act alone, but does the principle of this dictum go far enough? The essence of all liens lies in the necessity for credit—else why a lien? The party who buys material or incurs repairs or makes contracts under the state boat acts needs credit; otherwise he would pay cash. So that though under these acts it may not be necessary, when attempting to enforce such a lien in a state court, to show the necessity for credit, it is still presupposed or fully presumed. It is only in this sense that the dictum may be true. But when the attempt is made to enforce such contracts in the admiralty, the authorities seem to require that such necessity should be fully shown.

The leading case on this subject, Taylor v. Com. [Case No. 13,788], though reversed by Miller, J., on appeal [Id. 13,787], appears on the matter of lien to have been approved by him. The first decree was by the learned judge of the Eastern district of Missouri, Treat. It was ruled: 1st. "That while in foreign ports the presumption of necessity for relying upon the credit of the vessel for repairs, arises from the necessity of repairs to enable the vessel to prosecute the voyage; in home ports the presumption of a necessity for relying upon the credit of the vessel does not exist." 2d. "That in a foreign port the master, as performing the duties of that officer, has authority to bind the vessel and her owners for the necessary expenses of the boat; but in the home port he has not that right." 3d. "That while in a foreign port the necessary repairs are restricted to such as will enable the vessel to pursue her voyage with safety, the repairs in the home port, where they may be ordered by the owners, are not of such necessity restricted within such narrow limits." 4th. "Those, who in a home port, furnish repairs and supplies must show affirmatively, in order to have a lien on the vessel, that it was necessary to rely on the credit of the vessel; or, in other words, that the credit of the owners was not such as would justify a prudent man in furnishing repairs or supplies solely on their personal credit. Many persons in home ports have been accustomed, in consequence of the state boat acts, to suppose that repairs and supplies furnished there at the instance of the master gave a lien irrespective of all other considerations; but as they—so far as they trespass upon admiralty jurisdiction—are void, it is important that material men in home ports should bear in mind the distinction above stated, and the elements out of which a lien in a home port arises. If the owners are in good credit there is no necessity for relying upon the credit of the vessel, and consequently no lien is created."

This decision was made after the new 12th rule, but before The Lottawanna decisions, and what adds force to it is the fact that both Judge Treat and Justice Miller believed at the time, under the new rule, that libels in rem for repairs, supplies, etc., could be filed in the home as well as in the foreign port. The rea-

son given for the lien in the foreign port is that the owners have no credit, or no funds. And the presumption of want of credit is easily overturned if the owner is present or has an undoubted credit, as was the case in The Sultana (Pratt v. Reed, 19 How. [60 U. S.] 359), where Nelson, associate justice supreme court, delivered the opinion. The same rule is laid down by Clifford, J., in The Lulu, The Kalorama, and Gen'l Custer, 10 Wall. [77 U. S.] 200.

We now come to The Lottawanna, 21 Wall. [88 U. S.] 558, where it clearly appears that "credit to the ship" has not been dispensed with under the new rule. Says Bradley, J., "It is true the inconveniences arising from the often intricate and conflicting state laws creating such lien, induced this court in December term, 1858, to abrogate that portion of the 12th admiralty rule of 1844, which allowed proceedings in rem against domestic ships for repairs and supplies furnished in the home port, and to allow proceedings in personam only in such cases. But we have now restored the rule of 1844, or rather we have made it general in its terms, giving to material men, in all cases, their option to proceed either in rem or in personam. Of course, this modification of the rule cannot avail where no lien exists; but where one exists, no matter by what law, it removes all obstacles to a proceeding in rem, if credit is given to the vessel." It will be seen from this extract that the general rules of admiralty were in the mind of the court, and especially of the judge (Bradley) who delivered the opinion. When he speaks of the failure of the party claiming a lien to record his privilege, and adds, "had the lien been perfected * * * the principles that have heretofore governed * * * would have undoubtedly authorized the material man to file a libel against the vessel or its proceeds," he must be understood to include the general admiralty rules.

In an able review of the Lottawanna decision (21 Wall. [88 U. S.] 558), the following language is used: "It may be remarked, however, in passing, that the English and American law in denying the lien in question (in the home port) violated no recognized principle of the general maritime law. It is conceded that a lien is not implied in all cases, even of supplies furnished to a foreign vessel. Now it may be argued as a legal inference, a presumptio juris, that supplies furnished to a vessel in her home port, where she cannot be in distress, where she is under no exigency of completing her voyage and getting home, are not necessaries in any legal sense, and are furnished on the credit of the owner and not on that of the ship. This view of the subject reconciles the general principles of maritime law." The allusion to "credit of the owner himself and not that of the ship" shows that the writer understands Judge Bradley as upholding the foregoing construction of his language.

And Judge Clifford, in [The Lottawanna] 20 Wall. [87 U. S.] 219, thinking, as did Judges Miller and Treat, that the new rule put home and foreign ports on a like footing so far as filing libels by material men, maintained that the rule of credit being given to the ship still governed, in order to the creation of a lien. The reasoning of the painstaking and learned district judge, who penned the opinion in this case, whether the reader assents to it or not, must be acknowledged to be both ingenious and able. In The Dolphin [Case No. 3,973], something was said about the continental law on the subject of unpaid premiums of marine insurance being a lien on the vessel. The following information has, since the publication of 1 Flippin, been received relative to the law of different European states:

The law of Belgium (article 23, Code of Commerce) provides: "L'assureur a un privilége sur li chose assurée. Ce privilege est dispensé de toute inscription. Il prend rang immédiatement apres celui des frais. Il n'ex-

iste quelque soit le mode de payement de la prime que pour une somme correspondant a deux annuities." "The underwriter has a privilege on the thing assured. This privilege (or lien) takes rank immediately after legal costs or expenses. Such preference, no matter how the premium is to be paid, exists only for an amount corresponding to two annual premiums."

The law of Portugal, for which the reporter is indebted to the U. S. consular agent at Oporto, is as follows: "The underwriter has a lien on vessels for unpaid premiums of insurance, if the policy, on·account of which the premium is due, has not expired."

Through the courtesy of Chapman Coleman, Esq., second sec'y of the legation U. S., at Berlin, the following statement of the German commercial law on the subject has been received. The same was furnished by Baron Judge Diepenbroick-Gruter, president of the senate of the kammer court (the highest tribunal in Prussia.) "The German Commercial Law Book (Hendelsgesetzbuch), article 757, designates under ten heads the persons, who for certain claims, are entitled to the rights of creditors of a vessel (Schiffs-Gläubiger); i. e., who have a lien against the vessel as against a third party. Article 758. Assurers, as regards claims, do not belong to the category enumerated; nor is there any other provision of law which gives a lien of the character in question. As against a third party no such claim can therefore be enforced."

According to the law of Holland (letter received from D. Eckstein, Esq., consul at Amsterdam), "there is no Dutch law giving underwriters a lien on vessels for unpaid premiums of insurance."

Christian Bors, Esq., consul of Sweden and Norway at New York, writes, "that, according to the laws of Sweden and Norway, underwriters have a lien on vessels for unpaid claims; certain other claims, such as seamen's wages, etc., have, however, preference."

From the U. S. consulate (Henry B. Rydert, Esq.) at Copenhagen, the law of Denmark is ascertained to be: "The underwriter has no more lien for unpaid premium on a vessel than any other person." "The insurer, or the party who insures for another party, is liable for the premium." "The premium is payable immediately on entering or signing an agreement for insurance. If the premium is not paid immediately the underwriter has the option of cancelling the agreement for the time the premium is unpaid, provided the policy has not been handed over with a clause that the same is in force, whether the premium is paid or not."

Section 285 of the Italian maritime law reads as follows: "Privileged debts on vessels, their tackle, apparel and furniture are the following, (and the same are entitled to the priorities in which they are placed in this section.) * * * 10. Premiums of insurance on a vessel, her tackle, apparel and furniture for the last voyage, or on a time policy, and for steamers navigating at stated periods and insured on time policies the premium corresponding to the last six months and the adjustment and contribution of mutual insurance associations during the previous six months, are liens on vessels as above."

The Austrian law follows the French law. "Codice Commercio francese. Artic. 191.— Sono privilegiati i debiti indicati qui appresso secondo l'ordine in cui sono collocati. (1, 2, 3, 4, 5, 6, 7, 8, 9.) 10. L'ammontare dei premii d'assicurazione fatta sul corpo, chiglia, attrezzi, arredi, e sull' armamento e corredo del bastimento dovuti per l'ultimo viaggio." "The debts which follow are privileged (have a lien) according to the order in which they appear." "10. The amount of the premium of insurance made on the hull, keel, rigging, furniture, apparel, outfit (or armament, armamento) and equipment."

The Spanish law (section 598 of the Code of Commerce) reads as follows: "Privileged liens on vessels, in their order, are the following: 1. Debts to the state. 2. Judicial expenses. 3. Tonnage, anchorage and port duties. 4. Expenses of keeping vessel in repair—sanctioned by the competent commercial court. 5. Wages of captain and crew. 6. Debts contracted during the last voyage to meet the exigencies of voyage and crew. 7. Debts for the construction of the vessel. 8. Debts for provisioning vessel. 10. Premiums of insurance. 11. Other liens and debts. Para gozar de la preferencia que en su respectivo grado se marca á los creditos de que hace mencion el articulo 596, se han de justificar éstos en la forma siguente: 1. Los creditos de la Real Hacienda * * *. 2. Las costas judiciales * * *. 3. Los derechos de tonelados, * * *. 4. Los salarios y gastos de conservacion del buque * * *. 5. Los empenôs y sueldo del capitan y tripulacion * * *. 6. Los deudas contraidos para cubrir las urgencias de la nave durante el ultimo viage * * *. 7. Los creditos procedentes de la construccion ó venta del buque * * *. 8. Los provisiones para el apresto * * *. 9. Los prestamos a la gruesa * * *. 10. Los prémios de seguros, por las polizas y certificaciones de los corredores que intervenieron en ellos."

Though making endeavors in that regard the reporter was not able to procure satisfactory information as to what is the law, on this point, in Russia, Greece or Turkey.